1

2

3

4

5

6

7

8

FILED

2014 SEP -5  PM 2: 54

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY:_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2014 Grand Jury

CR 14 00512

UNITED STATES OF AMERICA,

                    Plaintiff,

                    v.

PRISCILLA VILLABROZA,
SHARON PATROW,
   aka "Sharon Garcia,"
SRI WIJEGOONARATNA, M.D.,
   aka "Dr. J,"
BOYAO HUANG, M.D.,
NANCY BRIONES, R.N., and
ROSEILYN MONTANA,

                    Defendants.

CR No. 14-

I N D I C T M E N T

[18 U.S.C. § 1347: Health Care
Fraud; 18 U.S.C. § 1956(h):
Conspiracy to Launder Monetary
Instruments; 18 U.S.C.
§ 1956(a)(1)(B)(i): Concealment
Money Laundering; 18 U.S.C. § 2:
Aiding and Abetting and Causing An
Act To Be Done]

     The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1347; 18 U.S.C. § 2]

A.   INTRODUCTORY ALLEGATIONS

     At all times relevant to the Indictment:

The Defendants, Their Co-Schemers, and Related Entities

     1.   California Hospice Care, LLC ("California Hospice") was
located at 740 East Arrow Highway, Suites C and D, Covina,
California, within the Central District of California.

2.    Defendant PRISCILLA VILLABROZA ("VILLABROZA") purchased and financed the purchase of California Hospice for approximately $300,000 in or about November 2007.

3.    In addition to California Hospice, defendant VILLABROZA owned and operated the following health care companies within the Central District of California and elsewhere:  Medcare Plus Home Health Providers, Inc., doing business as ("dba") Blue Diamond Home Health Providers ("Medcare Plus" or "Blue Diamond"), a purported home health agency; Excel Plus Home Health Services, Inc. ("Excel Plus"), a purported nursing registry; Unicare Health Professional ("Unicare"), a dba used by defendant VILLABROZA for herself; Unicare Health Professionals, LLC ("Unicare LLC"); and Nevada Home Health Providers, Inc. ("NHHP"), a purported home health agency.

4.    Defendant SHARON PATROW, also known as ("aka") "Sharon Garcia" ("PATROW"), defendant VILLABROZA's daughter, operated California Hospice with defendant VILLABROZA.

5.    Defendants VILLABROZA and PATROW were the only signatories on, and jointly controlled, California Hospice's bank account at Wells Fargo Bank, with an account number ending in 1910 (the "Wells Fargo Account").  Defendant VILLABROZA also controlled the bank accounts of Medcare Plus, Excel Plus, Unicare, Unicare LLC, and NHHP.

6.    Defendant SRI WIJEGOONARATNA, M.D., aka "Dr. J" ("WIJEGOONARATNA"), was a physician and patient recruiter at California Hospice.

7.    Defendant BOYAO HUANG, M.D. ("HUANG") was a physician at California Hospice.

8.    Defendant NANCY BRIONES, R.N. ("BRIONES") was a registered nurse and patient recruiter at California Hospice.

9.   Defendant ROSEILYN MONTANA ("MONTANA") was a patient recruiter at California Hospice.

10.   Co-schemer E.C. was the Director of Nursing ("DON") at California Hospice.

11.   Co-schemers M.S., K.C., and J.L. were quality assurance ("QA") nurses at California Hospice.

12.   Co-schemers D.G., E.O., and R.P. were patient recruiters at California Hospice.

The Medicare and Medi-Cal Programs

13.   Medicare was a federal health care benefit program, affecting commerce, that provided benefits to individuals who were over the age of 65 or disabled.

14.   Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS").

15.   Medi-Cal was a health care benefit program, affecting commerce, for indigent individuals in California.  Funding for Medi-Cal was shared between the federal government and the State of California.

16.   The California Department of Health Care Services ("CAL-DHCS") administered the Medi-Cal program.  CAL-DHCS authorized provider participation, determined beneficiary eligibility, issued Medi-Cal cards to beneficiaries, and promulgated regulations for the administration of the program.

17.   Individuals receiving Medicare and Medi-Cal benefits were known as "beneficiaries."  Each Medicare beneficiary was given a Health Identification Card Number ("HICN") unique to that beneficiary.

18.   Hospices, physicians, and other health care providers who provided services to beneficiaries that were reimbursed by Medicare and Medi-Cal were referred to as "providers."

19.   To become eligible to participate in Medicare, Medicare required prospective hospice providers to be licensed by a state or local agency.  After obtaining the applicable license, Medicare required prospective hospice providers to submit an application in which the prospective provider agreed to (a) comply with all Medicare-related laws and regulations, including the prohibition against payment of kickbacks for the referral of Medicare beneficiaries; and (b) not to submit claims for payment to Medicare knowing they were false or fraudulent or with deliberate ignorance or reckless disregard of their truth or falsity.  If Medicare approved the application, Medicare assigned the provider an identifying number, which enabled the provider to submit claims to Medicare for reimbursement for services provided to Medicare beneficiaries.

20.   To qualify for reimbursement for hospice services, Medicare and Medi-Cal required a physician to certify that a beneficiary was terminally ill.  Medicare and Medi-Cal considered a beneficiary to be "terminally ill" if the beneficiary's life expectancy was six months or less if the illness ran its normal course.  Hospice services reimbursed by Medicare and Medi-Cal were palliative rather than curative in nature and included, but were not limited to, medications to manage pain symptoms, necessary medical equipment, and the provision of bereavement services to surviving family members.

21.   If a beneficiary had a primary care physician ("PCP"), Medicare and Medi-Cal required the PCP and a physician at a hospice to certify in writing that the beneficiary was terminally ill with a

4

1  life expectancy of six months or less, if the terminal illness ran
2  its normal course.

3      22.  Medicare covered hospice services for those beneficiaries
4  who were eligible for Medicare Part A (hospital-related services).
5  When a Medicare beneficiary elected hospice coverage, the beneficiary
6  waived all rights to Medicare Part B (covering outpatient physician
7  services and procedures) coverage of services to treat or reverse the
8  beneficiary's terminal illness while the beneficiary was on hospice.

9      23.  A beneficiary could elect to receive hospice benefits for
10  two periods of 90 days and, thereafter, additional services for
11  periods of 60 days per period.

12      24.  After the first 90 day period, for the beneficiary to
13  continue to receive hospice benefits, Medicare required that a
14  physician re-certify that the beneficiary was terminally ill and
15  include clinic findings or other documentation supporting the
16  diagnosis of terminal illness.  For re-certifications on or after
17  January 1, 2011, Medicare required a hospice physician or nurse
18  practitioner to meet with the beneficiary in-person before signing a
19  certification of terminal illness.

20      25.  Most providers, including California Hospice, submitted
21  their claims electronically pursuant to an agreement with Medicare
22  that they would submit claims that were accurate, complete, and
23  truthful.

24  B.   THE FRADULENT SCHEME

25      26.  Beginning in or about November 2007, and continuing through
26  in or about June 2013, in Los Angeles County, within the Central
27  District of California, and elsewhere, defendants VILLABROZA, PATROW,
28  WIJEGOONARATNA, HUANG, BRIONES, and MONTANA, together with others

1  known and unknown to the Grand Jury, knowingly, willfully, and with

2  intent to defraud, executed and attempted to execute a scheme and

3  artifice: (a) to defraud health care benefit programs, namely,

4  Medicare and Medi-Cal, as to material matters in connection with the

5  delivery of and payment for health care benefits, items, and

6  services; and (b) to obtain money from Medicare and Medi-Cal by means

7  of material false and fraudulent pretenses and representations and

8  the concealment of material facts in connection with the delivery of

9  and payment for health care benefits, items, and services.

10      27.   The fraudulent scheme operated, in substance, in the

11  following manner:

12      Efforts to Conceal Defendant VILLABROZA's Interest in California

13      Hospice

14          a.   On or about August 15, 2007, federal agents executed a

15  search warrant at Medcare Plus.  Shortly thereafter, defendant

16  VILLABROZA learned that she was under investigation for health care

17  fraud and the payment of illegal kickbacks for the referral of

18  beneficiaries to Medcare Plus.

19          b.   On or about November 29, 2007, defendant VILLABROZA

20  purchased and financed the purchase of California Hospice.  To

21  conceal her ownership interest in California Hospice from federal

22  agents investigating fraud at Medcare Plus, from Medicare, and from

23  Medi-Cal, defendant VILLABROZA, in furtherance of the scheme to

24  defraud, identified, and caused to be identified, defendant PATROW

25  and co-conspirator E.C. as the co-owners of California Hospice on

26  documents filed with the State of California, Medicare, Medi-Cal, and

27  the Internal Revenue Service.

28

1    c.   On or about January 22, 2008, defendants VILLABROZA

2  and PATROW opened and caused to be opened the Wells Fargo Account for

3  California Hospice.   Defendant VILLABROZA funded the opening of the

4  Wells Fargo Account with a check from Excel Plus.

5    d.   Between in or about January 2008 and in or about July

6  2009, defendant VILLABROZA funded California Hospice's operations by

7  making deposits into the Wells Fargo Account.   California Hospice

8  generally recorded these deposits by defendant VILLABROZA in its

9  books and records as "Loans to/from Owners."

10    e.   On or about May 13, 2008, defendants VILLABROZA and

11  PATROW submitted and caused to be submitted a Medicare provider

12  application for California Hospice.   The application, signed by

13  defendant PATROW under penalty of perjury, was false because

14  defendant VILLABROZA's ownership interest in California Hospice was

15  not disclosed to Medicare as required by the application.

16    f.   On or about August 19, 2008, defendant VILLABROZA pled

17  guilty to participating in a scheme to defraud Medi-Cal operated out

18  of Medcare Plus, in violation of 18 U.S.C. § 1347, in United States

19  v. Villabroza, Case No. CR 08-782-GAF (Central District of

20  California).

21    g.   On or about April 16, 2009, defendants VILLABROZA and

22  PATROW submitted and caused to be submitted a provider application to

23  Medi-Cal, which defendant PATROW signed under penalty of perjury.   As

24  part of the application, and in furtherance of the scheme to defraud,

25  defendant PATROW falsely certified that no owner, officer, director,

26  employee or agent of California Hospice had been convicted of an

27  offense involving fraud on a government program within the previous

28  10 years.   This certification was false because, as defendant PATROW

1   then well knew, defendant VILLABROZA was an owner, employee, and

2   agent of California Hospice and had been convicted of health care

3   fraud in Case No. CR 08-782-GAF.  As a result of concealing defendant

4   VILLABROZA's interest in California Hospice in this manner,

5   defendants VILLABROZA and PATROW furthered the scheme to engage in

6   health care fraud, for had defendant VILLABROZA's true interest in

7   California Hospice been disclosed, California Hospice would not have

8   received a Medi-Cal provider number and would not have been able to

9   bill Medi-Cal fraudulently for health care services.

10          h.   Between in or about July 2009 and in or about July

11  2011, defendant VILLABROZA wrote checks from the Wells Fargo Account

12  to Medcare Plus, Unicare, Excel Plus, and NHHP using funds obtained

13  from Medicare and Medi-Cal for purportedly providing hospice-related

14  services to beneficiaries.  These checks were frequently recorded in

15  California Hospice's books and records as "Loans to/from Owners."

16          i.   On or about May 26, 2010, defendant VILLABROZA filed

17  for Chapter 7 bankruptcy, in the Central District of California, Case

18  No. 10-17107-RK (the "Villabroza Bankruptcy").  In connection with

19  the Villabroza Bankruptcy, and in furtherance of the scheme to

20  defraud, defendant VILLABROZA filed a petition, which she signed

21  under penalty of perjury, in which defendant VILLABROZA, among other

22  false statements, concealed and failed to disclose her ownership

23  interest in California Hospice.

24          j.   On or about July 24, 2011, in connection with

25  defendant VILLABROZA's sentencing in Case No. CR 08-782-GAF, and in

26  furtherance of the scheme to defraud, defendants VILLABROZA and

27  PATROW submitted a letter to the United States District Court falsely

28  stating that defendant VILLABROZA "has no ownership interest, nor

exercises any influence or control over California Hospice Care, LLC." This statement was false because, as defendants VILLABROZA and PATROW then well knew, defendant VILLABROZA was an owner of California Hospice and defendant VILLABROZA controlled the Wells Fargo Account.

k. While defendant VILLABROZA was serving the sentence in Case No. CR 08-782-GAF, defendant VILLABROZA continued to manage the operations of California Hospice, including through directions given during meetings with defendant PATROW and co-schemer E.C.

Recruitment of Beneficiaries and Fraudulent Hospice Admissions

l. California Hospice received few, if any, referrals from beneficiaries' PCPs. Rather, defendants VILLABROZA and PATROW paid patient recruiters, known as "marketers" or "cappers," including defendant MONTANA and co-schemers R.P., E.O., and D.G., illegal kickbacks in exchange for their referring beneficiaries to California Hospice. The amount of the kickback varied depending on the agreement between defendant VILLABROZA, defendant PATROW, and the marketer, but generally ranged between $400 and $1000 per month for each month a beneficiary referred by the marketer purportedly received hospice-related services.

m. Defendant MONTANA referred beneficiaries to California Hospice knowing that the beneficiaries were not terminally ill.

n. Defendants VILLABROZA and PATROW paid marketers in a variety of ways, including by checks drawn on the Wells Fargo Account, the accounts of Unicare and Unicare LLC, and personal bank accounts, as well as in cash.

o. For some of the marketers, including co-schemer R.P., defendant VILLABROZA would decide whether to refer the beneficiary to

1    one of defendant VILLABROZA's home health care companies, such as

2    Blue Diamond, and bill or cause Medicare or Medi-Cal to be billed for

3    home health care services, or to refer the beneficiary to California

4    Hospice, and bill or cause Medicare or Medi-Cal to be billed for

5    hospice-related services.

6         p.    Defendants VILLABROZA and PATROW referred to marketers

7    as "business liaisons," "community liaisons," and "business

8    development representatives" in an effort to disguise the illegal

9    nature of their illegal kickback relationship with these marketers.

10        q.    Defendants VILLABROZA and PATROW also paid medical

11   professionals, including defendant WIJEGOONARATNA and defendant

12   BRIONES, illegal kickbacks for referring beneficiaries to California

13   Hospice.  A significant number of the beneficiaries referred by

14   defendant WIJEGOONARATNA were drug addicts who sought hospice care in

15   order to obtain access to high-strength prescription pain killers.

16        r.    If a recruited beneficiary was eligible to receive

17   hospice benefits from Medicare or Medi-Cal, co-schemers E.C. or M.S.

18   would direct an R.N., such as defendant BRIONES, to conduct an

19   initial assessment.  During these assessments, defendant BRIONES

20   observed that virtually all of the beneficiaries referred to

21   California Hospice were not terminally ill.  Nevertheless, in an

22   effort to make it appear that these beneficiaries suffered from very

23   serious medical conditions, defendant BRIONES created false medical

24   records, including "Functional Assessment Scales," in which defendant

25   BRIONES falsely stated that the beneficiary could not speak.

26        s.    Regardless of the outcome of the assessment performed

27   by the R.N., defendant WIJEGOONARATNA, defendant HUANG, or another

28   California Hospice physician created a fraudulent diagnosis and

1  falsely certified that the beneficiary was terminally ill.  In fact,

2  and as defendants WIJEGOONARATNA and HUANG then well knew from

3  examining the beneficiaries and reviewing the beneficiaries' medical

4  records, the overwhelming majority of California Hospice

5  beneficiaries were not terminally ill.

6          t.    Once the beneficiary was admitted to hospice,

7  defendants VILLABROZA and PATROW caused California Hospice to

8  fraudulently bill Medicare or Medi-Cal for purportedly providing

9  hospice-related services, which were in fact unnecessary.

10          u.    To convince beneficiaries to sign up for unnecessary

11  hospice care, marketers, including defendant BRIONES, falsely

12  promised beneficiaries that accepting services from California

13  Hospice would not affect the beneficiaries' ability to receive

14  services from the beneficiaries' primary care physician ("PCP").

15          v.    For instance, in or about March 2011, defendant

16  BRIONES falsely told beneficiary J.R. that J.R. could remain on the

17  United Network of Organ Sharing ("UNOS") liver transplant list at the

18  University of California, Los Angeles ("UCLA") even if J.R. elected

19  to receive hospice services.  Defendant WIJEGOONARATNA, without

20  consulting J.R.'s PCP, admitted J.R. to California Hospice.  In or

21  about June 2011, UCLA, believing that J.R. wished to receive

22  palliative hospice care rather than a liver transplant, removed J.R.

23  from the UNOS transplant list.  Once J.R. learned of her removal from

24  the UNOS transplant list, J.R. and J.R.'s spouse terminated hospice

25  services and J.R. was eventually reinstated to the UNOS liver

26  transplant list.

27          w.    In response to California Hospice's high volume of

28  claims, a Medicare contractor issued California Hospice Additional

1   Development Requests ("ADRs"), which sought further documentation to

2   support claims for hospice-related services.

3          x.   To support the fraudulent diagnoses of terminal

4   illness made by defendant WIJEGOONARATNA and defendant HUANG and to

5   secure payments from Medicare, co-schemers E.C., M.S., K.C., J.L.,

6   with the knowledge and assent of defendant PATROW, submitted and

7   caused to be submitted to Medicare false information, including

8   medical records they altered and caused to be altered in response to

9   ADRs.  In particular, and in effort to make it appear that

10  beneficiaries were terminally ill, advanced directives were altered

11  to make it appear that the beneficiaries did not want to receive CPR

12  or other heroic measures when, in fact, the true advanced directives

13  completed by the beneficiaries had stated that such life-saving

14  procedures should be performed in the event of a medical crisis.

15  Medicare submitted payment on claims subject to an ADR to the Wells

16  Fargo Account controlled by defendants VILLABROZA and PATROW.

17         y.   Between in or about March 2009 and in or about June

18  2013, defendants VILLABROZA, PATROW, WIJEGOONARATNA, HUANG, BRIONES,

19  and MONTANA submitted and caused to be submitted false and fraudulent

20  claims to Medicare and Medi-Cal for hospice-related services in the

21  amounts of approximately $6,861,346 and $2,049,356, respectively.

22  Based on these claims, Medicare and Medi-Cal paid California Hospice

23  approximately $5,464,568 and $1,968,761, respectively.  Payment on

24  these false and fraudulent claims was made electronically to the

25  Wells Fargo Account.

26  C.   EXECUTIONS OF THE FRAUDULENT SCHEME

27       28.  On or about the dates set forth below, within the Central

28  District of California, and elsewhere, the following defendants,

12

together with others known and unknown to the Grand Jury, for the purpose of executing the scheme to defraud described above, knowingly and willfully submitted and caused to be submitted to Medicare the following false and fraudulent claims for hospice-related services:

| COUNT | DEFENDANTS | CLAIM NO. | DATE CLAIM SUBMITTED | AMOUNT OF CLAIM | BENEFICIARY |
|---|---|---|---|---|---|
| ONE | VILLABROZA, PATROW, WIJEGOONARATNA | 21025100636302 | 9/3/2010 | $6,258.98 | A.D. |
| TWO | VILLABROZA, PATROW, WIJEGOONARATNA | 21025100636402 | 9/3/2010 | $6,258.98 | F.O. |
| THREE | VILLABROZA, PATROW, WIJEGOONARATNA | 21025100636502 | 9/3/2010 | $6,258.98 | L.O. |
| FOUR | VILLABROZA, PATROW, WIJEGOONARATNA, BRIONES | 21030700441302 | 11/3/2010 | $6,303.08 | R.V. |
| FIVE | VILLABROZA, PATROW, WIJEGOONARATNA, BRIONES | 21109600012202 | 4/5/2011 | $6,783.58 | J.R. |
| SIX | VILLABROZA, PATROW, WIJEGOONARATNA, BRIONES | 21109700705308 | 4/7/2011 | $5,097.35 | E.U. |
| SEVEN | VILLABROZA, PATROW, WIJEGOONARATNA, MONTANA | 2111260015540 | 5/5/2011 | $6,292.35 | F.L. |
| EIGHT | VILLABROZA, PATROW, WIJEGOONARATNA, MONTANA | 21112600154902 | 5/5/2011 | $5,892.35 | E.R. |
| NINE | VILLABROZA, PATROW, WIJEGOONARATNA, BRIONES | 21203000050302 | 1/30/2012 | $5,753.40 | M.H. |
| TEN | VILLABROZA, PATROW, HUANG, | 21218700664807 | 7/5/2012 | $6,676.50 | S.C. |
| ELEVEN | VILLABROZA, PATROW, HUANG, BRIONES | 21223600358207 | 8/23/2012 | $6,754.16 | A.G. |

| COUNT | DEFENDANTS | CLAIM NO. | DATE CLAIM SUBMITTED | AMOUNT OF CLAIM | BENEFICIARY |
|---|---|---|---|---|---|
| TWELVE | VILLABROZA, PATROW, HUANG, BRIONES | 21231000 956307 | 11/5/2012 | $6,454.16 | J.S. |
| THIRTEEN | VILLABROZA, PATROW, HUANG, BRIONES | 21234001 049407 | 12/5/2012 | $6,582.70 | S.F. |

COUNT FOURTEEN

[18 U.S.C. § 1956(h), 2(b)]

[Defendants VILLABROZA and PATROW]

29.   The Grand Jury repeats and alleges paragraphs 1-27 of this Indictment as if fully set forth herein.

A.   THE OBJECT OF THE CONSPIRACY

30.   Beginning in or about June 2009, and continuing until in or about June 2013, in Los Angeles County, within the Central District of California, and elsewhere, defendants VILLABROZA and PATROW, and others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to commit the following offense against the United States: money laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(A)(i), by conducting financial transactions and attempting to conduct financial transactions, affecting interstate commerce, with the proceeds of specified unlawful activity, namely, health care fraud, committed in violation of Title 18, United States Code, Section 1347, with the intent to promote the carrying on of such specified unlawful activity.

B.   THE MANNER AND MEANS OF THE CONSPIRACY

31.   The object of the conspiracy was carried out, and was to be carried out, in substance, as set forth in paragraphs 1-27 of this Indictment, and as follows:

a.   Beginning in or about July 2009 and November 2009, respectively, Medicare and Medi-Cal began remitting payments to the Wells Fargo Account based on false and fraudulent claims for hospice-related services which defendants VILLABROZA and PATROW submitted and caused to be submitted on behalf of California Hospice.  These claims were fraudulent because, among other things, as defendants VILLABROZA

1  and PATROW then well knew, virtually all of California Hospice's

2  patients were not terminally ill, and these claims were supported in

3  many instances by fabricated and false documents submitted in

4  response to ADRs.

5          b.    Using the proceeds of health care fraud, defendants

6  VILLABROZA and PATROW paid recruiters, including defendants

7  WIJEGOONARATNA, BRIONES, and MONTANA, and co-conspirators D.G., E.O,

8  and R.P., for referring beneficiaries to California Hospice.

9          c.    Defendant VILLABROZA wrote checks from the Wells Fargo

10 Account to accounts she controlled and maintained in the names of

11 Unicare and Unicare LLC at Wells Fargo and Bank of America,

12 respectively, and to defendant PATROW's personal account at Bank of

13 America; and defendant VILLABROZA used the proceeds of the health

14 care fraud offenses described herein to pay marketers, including

15 defendant MONTANA and co-conspirators D.G. and R.P. and others, for

16 referring new and additional beneficiaries to California Hospice.

17 These checks were recorded in the books and records of California

18 Hospice as "Loans to/from Owners" or "Professional Fees: Consulting."

19 Some of the checks indicated the name of the marketer to be paid in

20 the memo line.

21          d.    Defendant PATROW wrote checks from the Wells Fargo

22 Account to pay marketers, including defendants WIJEGOONARATNA and

23 MONTANA and co-conspirator D.G., for referring new and additional

24 beneficiaries to California Hospice.  Defendant PATROW also wrote

25 checks from the Wells Fargo Account to herself and to co-conspirator

26 E.C., which defendant PATROW cashed and then used the cash to pay

27 California Hospice's marketers.  The memo line on the cashed checks

28

1    indicated that the checks were for "expenses," "services,"

2    "reimbursement," or "loan payment."

3         e.   Using the proceeds of health care fraud transferred

4    from California Hospice, defendants VILLABROZA and PATROW further

5    wrote checks and caused checks to be written from defendant PATROW's

6    personal bank account at Bank of America to marketers, including co-

7    conspirator R.P., or to the spouse of a marketer.

8         f.   During the course of the conspiracy, defendants

9    VILLABROZA and PATROW laundered at least $700,000 from the proceeds

10   of health care fraud to pay marketers.

11   C.   OVERT ACTS

12        32.   In furtherance of the conspiracy and to accomplish its

13   object, defendants VILLABROZA and PATROW, together with others known

14   and unknown to the Grand Jury, committed and willfully caused others

15   to commit the following overt acts, among others, in the Central

16   District of California, and elsewhere:

17        Overt Act No. 1:   On or about June 10, 2009, defendant

18   VILLABROZA signed check number 1431, drawn on the Wells Fargo

19   Account, and made payable to co-conspirator D.G. in the amount $400,

20   with an entry in the memo line of "supplies."

21        Overt Act No. 2:   On or about September 9, 2009, defendant

22   PATROW signed check number 1626, drawn on the Wells Fargo Account,

23   and made payable to defendant Montana in the amount $2,200.

24        Overt Act No. 3:   On or about October 12, 2009, defendant

25   PATROW signed check number 1663, drawn on the Wells Fargo Account,

26   and made payable to defendant Montana in the amount $1,800.

27

28

Overt Act No. 4:   On or about October 26, 2009, defendant PATROW signed check number 1741, drawn on the Wells Fargo Account, and made payable to defendant Montana in the amount $500.

Overt Act No. 5:   On or about December 14, 2009, defendant PATROW signed check number 1900, drawn on the Wells Fargo Account, and made payable to defendant Montana in the amount $5,000.

Overt Act No. 6:   On or about December 28, 2009, defendant VILLABROZA signed check number 1264, drawn on the Wells Fargo Account, with a memo line of "[D.G.] — Oct. Pay," and made payable to Unicare in the amount of $1,200.

Overt Act No. 7:   On or about January 13, 2010, defendant VILLABROZA signed check number 1270, drawn on the Wells Fargo Account, with a memo line of "[R.P.'s] Check," and made payable to Unicare in the amount of $500.

Overt Act No. 8:   On or about January 22, 2010, defendant VILLABROZA signed check number 1151, drawn on the Wells Fargo Account, and made payable to Unicare in the amount of $10,000.

Overt Act No. 9:   On or about January 22, 2010, defendant VILLABROZA signed check number 180, drawn on the Unicare bank account at Wells Fargo, and made payable to defendant Montana in the amount of $1,000.

Overt Act No. 10:   On or about January 25, 2010, defendant PATROW signed check number 2069, drawn on the Wells Fargo Account, and made payable to co-conspirator D.G. in the amount $2,450.

Overt Act No. 11:   On or about April 26, 2010, defendant VILLABROZA signed check number 1306, drawn on the Wells Fargo Account, and made payable to Unicare in the amount of $7,500.

1    Overt Act No. 12:   On or about May 1, 2010, defendant
2  VILLABROZA signed check number 1050, drawn on the Unicare LLC bank
3  account at Bank of America, and made payable to co-conspirator D.G.
4  in the amount of $800.

5    Overt Act No. 13:   On or about July 9, 2010, defendant PATROW
6  signed check number 3002, drawn on the Wells Fargo Account, and made
7  payable to defendant Montana in the amount $2,000.

8    Overt Act No. 14:   On or about December 23, 2010, defendant
9  PATROW signed check number 4002, drawn on the Wells Fargo Account,
10  and made payable to defendant Montana in the amount $1,900.

11    Overt Act No. 15:   On or about January 21, 2011, defendant
12  VILLABROZA signed check number 1575, drawn on defendant PATROW's
13  personal account at Bank of America, and made payable to co-
14  conspirator R.P. in the amount of $800.

15    Overt Act No. 16:   On or about February 16, 2011, defendant
16  PATROW signed check number 1581, drawn on her personal Bank of
17  America account, and made payable to G.P., the spouse of co-
18  conspirator R.P., in the amount of $1,300.

19    Overt Act No. 17:   On or about March 2, 2011, defendant PATROW
20  signed check number 1584, drawn on her personal Bank of America
21  account, and made payable to G.P., the spouse of co-conspirator R.P.,
22  in the amount of $800.

23    Overt Act No. 18:   On or about March 10, 2011, defendant PATROW
24  signed check number 4340, drawn on the Wells Fargo Account, and made
25  payable to defendant Montana in the amount $1,100.

26    Overt Act No. 19:   On or about March 10, 2011, defendant PATROW
27  signed check number 4336, drawn on the Wells Fargo Account, and made
28  payable to co-conspirator D.G. in the amount $600.

1    Overt Act No. 20:   On or about April 25, 2011, defendant PATROW
2    signed check number 4594, drawn on the Wells Fargo Account, and made
3    payable to defendant Wijegoonaratna in the amount $5,380.65.

4    Overt Act No. 21:   On or about May 25, 2011, defendant PATROW
5    signed check number 4716, drawn on the Wells Fargo Account, and made
6    payable to defendant Wijegoonaratna in the amount $6,450.

7    Overt Act No. 22:   On or about January 10, 2012, defendant
8    PATROW signed check number 6845, drawn on the Wells Fargo Account,
9    and made payable to co-conspirator D.G. in the amount $600.

10   Overt Act No. 23:   On or about July 25, 2012, defendant PATROW
11   signed check number 5267, drawn on the Wells Fargo Account, and made
12   payable to herself in the amount of $11,001.

13   Overt Act No. 24:   On or about December 20, 2012, defendant
14   PATROW signed check number 5769, drawn on the Wells Fargo Account,
15   and made payable to herself in the amount of $15,000.

16   Overt Act No. 25:   On or about January 25, 2013, defendant
17   PATROW signed check number 5892, drawn on the Wells Fargo Account,
18   and made payable to herself in the amount of $10,200.

19   Overt Act No. 26:   On or about March 4, 2013, defendant PATROW
20   signed check number 7080, drawn on the Wells Fargo Account, and made
21   payable to herself in the amount of $5,000.
22   ///
23   ///
24   ///
25
26
27
28

COUNTS FIFTEEN THROUGH TWENTY-FIVE

[18 U.S.C. § 1956(a)(1)(B)(i), 2(b)]

[Defendants VILLABROZA and PATROW]

33.   The Grand Jury hereby repeats and alleges 1-27 and 31 of this Indictment as if fully set forth herein.

34.   On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, the following defendants, together with others known and unknown to the Grand Jury, knowing that the property involved in each of the financial transactions described below represented the proceeds of some form of unlawful activity, conducted and willfully caused others to conduct the following financial transactions, affecting interstate commerce, which transactions in fact involved the proceeds of specified unlawful activity, namely, health care fraud, in violation of Title 18, United States Code, Section 1347, knowing that each of the transactions was designed in whole and in part to conceal and disguise the nature location, source, ownership, and control of the proceeds of such specified unlawful activity:

| COUNT | DEFENDANTS | DATE | FINANCIAL TRANSACTION |
|---|---|---|---|
| FIFTEEN | VILLABROZA | 10/27/2009 | Signed and deposited check number 1141, drawn on the Wells Fargo Account, in the amount of $6,000, made payable to Unicare. |
| SIXTEEN | VILLABROZA | 12/18/2009 | Signed and deposited check number 1244, drawn on the Wells Fargo Account, in the amount of $15,000, made payable to Unicare. |
| SEVENTEEN | VILLABROZA | 12/28/2009 | Signed and deposited check number 1264, drawn on the Wells Fargo Account, in the amount of $1,200, made payable to Unicare. |
| EIGHTEEN | VILLABROZA | 1/13/2010 | Signed and deposited check number 1270, drawn on the Wells Fargo Account, in the amount of $500, made payable to Unicare. |

| COUNT | DEFENDANTS | DATE | FINANCIAL TRANSACTION |
|---|---|---|---|
| NINETEEN | VILLABROZA | 10/22/2010 | Signed and deposited check number 1424, drawn on the Wells Fargo Account, in the amount of $5,000, made payable to Unicare. |
| TWENTY | VILLABROZA | 11/19/2010 | Signed and deposited check number 1445, drawn on the Wells Fargo Account, in the amount of $5,000, made payable to Unicare. |
| TWENTY-ONE | VILLABROZA | 2/15/2011 | Signed and deposited check number 1486, drawn on the Wells Fargo Account, in the amount of $5,000, made payable to Unicare. |
| TWENTY-TWO | VILLABROZA, PATROW | 1/21/2011 | Defendant VILLABROZA signed check number 1575, drawn on defendant PATROW's personal Bank of America account, in the amount of $800, and made payable to R.P. |

///

///

///

| COUNT | DEFENDANTS | DATE | FINANCIAL TRANSACTION |
|-------|-----------|------|----------------------|
| TWENTY-THREE | PATROW | 12/20/2012 | Signed and negotiated check number 5769, drawn on the Wells Fargo Account, in the amount of $15,000, made payable to defendant PATROW. |
| TWENTY-FOUR | PATROW | 2/25/2013 | Defendant PATROW signed check number 7077, drawn on the Wells Fargo Account, in the amount of $5,000, made payable to E.C. |
| TWENTY-FIVE | PATROW | 3/4/2013 | Signed and negotiated check number 7080, drawn on the Wells Fargo Account, in the amount of $5,000, made payable to defendant PATROW. |

A TRUE BILL

/s/

_____
Foreperson

STEPHANIE YONEKURA
Acting United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

RICHARD M. ROBINSON
Assistant United States Attorney
Chief, Major Frauds Section

GRANT B. GELBERG
Assistant United States Attorney
Major Frauds Section